May it please the Court, James Ferguson on behalf of Cook Medical. In the proceedings below, Cook argued that respondents' litigating position stood out as extraordinarily weak in two fundamental ways. The first related to the weakness of patent claims. The second related to the weakness of the form choice. In making these arguments, Cook relied on facts that were all undisputed. They were undisputed in the district court. They were undisputed on appeal. In the case of the patent claims, for example, it is undisputed that the inventor admitted at his deposition that he had copied from a Cook device the very on obviousness grounds. It is also undisputed that five pieces of prior art that Cook had cited early in the litigation, each fully disclosed. When you say cited early in the litigation, you mean principally the Leslie and amidst a welter of other invalidity contentions that didn't even meet the local rules of specifying precisely what read on or fit which elements? Most respectfully, Your Honor, I would not characterize it that way. The welter of other references that we cited related to other limitations in the patent. With respect to the sheath movement element, we cited five references. We specifically identified those references. We specifically recited the prosecution history. And these were the same references that the PTAB relied on in granting our petition. So yes, they did include Leslie. And yes, they did include the other four. And there is no dispute. So kind of at the heart, as I read it, of Judge McKinney's opinion is this idea that if this is so darn clear, you really have an obligation to isolate the key thing, Leslie and the other. Either or both, file a summary judgment motion or ask for permission to do so. Or at least send a notice to the other side and say this patent assertion is ridiculous on this very particular ground. And if you continue, you're going to be in trouble. And there was none of that. I think I agree with you that there is that theme in Judge McKinney's opinion. In order to understand the litigation realities that we were facing, it's important to put it in context. We recognize, particularly after the inventor's deposition. Well, this was in January, right? January of 2016. The inventor's deposition was June. And this was after you had done all the work to compile your invalidity contention. That's correct, Your Honor. Which was a couple of months earlier. And after you had filed claim construction proposals for 25 claims, which you eventually withdrew most of. Why, if it was so obvious upon looking at this patent, that if you take, was it Sugita? Is that what it is? Correct. Sugita, and then add Leslie or the other things. Why did you not make that very simple point either through a request to file a summary judgment motion or at least in a letter to the other side so that it could focus on what you had decided was so compellingly clear that it was objectively unreasonable to proceed? Let me preface my answer by saying it was objectively clear that it wasn't valid. And the most compelling proof of that was their decision to cancel their patent rather than submit it to merits determination before the detail. There's no question the patent was invalid. Now here are the litigation realities we face. We had a pending motion to transfer before the Texas court that went undecided for 10 months. How many times did you have to go down to Eastern District during that period? I had to go down to appear in court once. All right, so what's the big deal? Well, what I'm focusing on... The litigation was not stopping, right? No, litigation... And all of that would have been perfectly transferable to Indiana. Of course, of course. But my point is that we had the pending motion to transfer before the court for 10 months. So when we're faced with the question, what is the pathway that is going to get us out most quickly from this litigation, given the compelling evidence of invalidity? The answer, it did not seem to us, would be to file an early summary judgment motion when there was a pending motion to transfer before the district court in Texas. But follow up on Judge Toronto's question to you. I practiced law for 20 years. I routinely would write to opposing counsel and say, say I've got your complaint here and you're missing an element. Here's the Supreme Court, state Supreme Court case that says you need that element. Why don't you just drop it so that we don't have to waste money on both sides? And by the way, if you don't, I'll attach this letter as an exhibit to my motion for attorney's fees. Because neither the Rule 11 nor the early summary judgment was going to give us an early exit. We, the district court in Texas... Okay, why? Because the district court in Texas had a directed the district courts to resolve the motion to transfer before it engages in any substantive decision making. But that doesn't mean that your opposing counsel can't take it and say, holy cow, drop it. Well, let me... Was there communication? Well, there were communications and we sent the prior art to them and we sent the, I'm sorry, the prior art disclosures, even after we filed our petition with the PTAB in March, which laid out all of this, it resulted in no response from the other side. What we're arguing about here is litigation choices that we made, which the other side argues and Judge McKinney apparently believed, showed that we really didn't believe that this patent was invalid. That's not true. So, I mean, one possibility, I'm not sure what Judge McKinney thought, one possibility is it took you rather a long time to figure out the invalidity, which tends, if that were the explanations, tends to suggest maybe it wasn't so glaringly obvious, or maybe it was that you were using this as a test case to run up the costs so that you can, you could ping the people that you're trying to get because you don't like the general practice of non-practicing entity litigation by these people or others, and there's some email that you included in December of 2016 suggesting that. There may be other... Anyway. Well, first, Your Honor, let me make very clear, my client had no interest in running up the costs. I'm not sure what email you're referring to. This is the email on page 1717 of the appendix when you said we need to have you in the PTO seek an adverse judgment in the IPR, and I'm not going to... I'm not going to elaborate on the reasons, but Cook declines to share with SBI its strategic reasons for invalidating the patent other than to note Cook's obvious interest in deterring other NPEs from filing baseless suits against Cook in the future. This is why Google, Hewlett-Packard, and other major corporations require patent invalidation as a condition of IPR settlement with NPEs. Yes. That's what I was referring to. Yeah, and that refers to Cook's interest in deterring future frivolous claims by NPEs. Have you had discussions with Google and Hewlett-Packard and others about this practice? No, I haven't. I haven't had discussions that I can disclose about deterring this practice. Google is a client of our firm, and Google has insisted, my understanding... These are potential buyers of licenses from NPEs that are coordinating? No, there's no coordination. These are companies that have been sued in baseless suits by NPEs. They have an interest in deterring that practice. That was our interest. We had no interest in running up the fees, and indeed, that was precisely why we chose the IPR route. Let me return to your... Why did you choose not to do what Judge Wallach was suggesting? Because... You look at this patent. If you think you're talking to your own people, Cook, and I don't know how long it took Cook to find the right time period for its basket, maybe not much at all, and how long it took you to look at Leslie, there aren't that many patents listed on the front end. Leslie is an extraordinary piece of prior art. It was issued three weeks before this patent or something. Why don't you write to the other side and say, we don't need to go through all this invalidity contention. We don't need to do all this claim construction. We don't need to go through the IPR, or tell us why we're wrong in thinking this is glaringly obvious. Because it was our judgment that that was not going to lead to the result we were seeking, which was an early exit. What would have been the harm? There wouldn't have been a harm, but it wouldn't have been likely to achieve the early exit that we wanted. And it certainly did not reflect our view that this prior art was not compelling. You just acknowledged, Your Honor, that this was a compelling piece of prior art, among many others, let alone the admissions of the inventor in his deposition. To whom was that email directed? I'm sorry, Your Honor. The 1717 email. In the record, it's 1717, 25 October 2016. Was it to Mr. Salmon? It says Al. Oh, it was to the SBI lawyers. Salmon was on it. Mr. Salmon was copying. Well, it seems to me that that's more or less the kind of letter I was talking about. I understand. And maybe we could have written a letter, but my professional judgment that it would have resulted in the exit. Well, what I'm saying is that email is sort of the kind of communication I'm talking about. That is, it says, we're not friends, but I'm telling you, if you don't drop this, in fact, you say, if you don't accept our settlement, then you're going to be sorry. I recognize that. I recognize that. Let me return. It's just that it came very late, right? And the proceedings then ended, what, six weeks later? Yes. Yes, the proceedings ended six weeks later. So why didn't you send something like that before? I didn't think it would produce the result we were likely to see. And I think the proof of the pudding is even when we filed the PTAB petition, laying everything out, Leslie, the inventor's deposition, it didn't deter them from continuing in the litigation. If I can return to the motion transfer that was before the Texas court. They agreed there was an unopposed motion to stay pending the transfer. When did they agree? Well, E.D. Texas, they transferred it on 3-28, on March 28th. And then there was a motion, the parties jointly moved to stay, I'm sorry, in June, right? Right. Correct. Okay. Can I ask you a factual question? Sure. Leslie, was that provided to the examiner by Dr. Dinza or whoever was prosecuting the application or was that something the examiner came up with and added? I haven't been able to find online the prosecution history. I don't recall whether the examiner found it or whether it was provided by the applicant during the prosecution history. The prosecution history is extremely telling on that point, though, Your Honor, because Leslie became relevant for our purposes only after the applicant added the sheath movement element to overcome the two prior rejections. In other words, whether it was provided by the applicant or the examiner had discovered it, that was just as an example of a prior device in this field. Once the applicant added the sheath movement element and then persuaded the examiner that the sheath movement element conferred novelty on the invention, the applicant had an affirmative obligation to disclose that fact to Leslie, particularly since we now know that the applicant had actually copied the same element from a cook device. He made no such disclosure. So the argument that Judge McKinney relied on, that this was one of these references was before the prior art, the record conclusively shows that the applicant considered it from the standpoint of the sheath movement element because the applicant had violated his duty of candor. One other point I want to make. So just tell me if I'm wrong in understanding literally what happened. The only basis for the colloquies, the back and forth between the examiner and the applicant was Sugita. Do I have that name right? You do. Okay. And Sugita, the applicant said, that doesn't have the sheath moving, it has the wire moving. And as far as I could tell, that's true. And there was never any discussion, even an assertion, though I suppose it might be, there was never any affirmative assertion, you can't find a moving sheath over a wire in any prior art. The discussion was entirely about Sugita in which the applicant's grounded distinction not only was correct but was adopted by the examiner allowing insertion of new language into the. That's correct. Okay. That's correct. And for your purposes, that exchange appears in the appendix of 1446, 1447. Did you have one final point? I mean, your time has expired. Yeah, this case raises an issue that transcends the facts, transcends the parties, and that is to what extent should individuals in the position of Messrs. Mitri and Salmon be held accountable for baseless litigation that they file across the country? Thank you. You've exhausted your rebuttal. We're still talking about it. Thank you. Ready? May it please the Court. My friend addresses what he says was the litigation context that he's facing, but he doesn't properly place that context into the legal context that governs these matters. With respect to the idea of a letter or Rule 11 activity, Rule 11 requires that Rule 11 motions be made as soon as practicable, as early as possible in the process. And the whole point of that requirement is to avoid situations, like my friend says, are present here. Had he done what Rule 11 requires of a party who believes what he says he believed, he would have taken action immediately to submit a safe harbor motion. What is your response to his statement, I think, that it was pretty reasonable for him to conclude that that would have been pointless since, among other things, you didn't cease the proceedings when presumably you saw Dr. Smith's position give the answers that he gave. So we disagree very strongly with that, Judge Toronto. There's a big difference between what happens when issues are being litigated on their merits, when parties are expressing their competing views, and when one officer of the court tells another that a claim falls so far below the standard that it should be dropped immediately. Now, if counsel were to have said that this case is frivolous, this case falls below that standard in a letter, as Judge Wallach suggested, or in a safe harbor motion as required by Rule 11b, that creates a very different context than the ordinary interaction of litigation, where parties exchange positions and fight about them. Go ahead. Mr. Mitty and Salmon, is that right? Mitry and Salmon, Your Honor. Are they officers of the court? They're both lawyers. They're not practicing at this point, Your Honor. Are they licensed? I don't know the current status of their licenses, but certainly in the past they have been licensed. So they have a pattern of conduct across the United States, for which the appellant makes a pretty good argument, don't they? Well, Your Honor, the evidence, the actual evidence of a pattern is that lawsuits have been filed. Without more... Lawsuits have been filed by unique entities, each created to file that one lawsuit, and where attorneys' fees are awarded, that one entity defaults. So that's not quite right, Your Honor. It's not. Have those entities paid those attorneys' fees? The only evidence was that out of approximately 400 cases, there were two in which attorneys' fees were ordered. And were those paid? I don't think there's anything in the record regarding that. One of those matters is active, the other was settled. But I don't think there was anything in the record. But, Your Honor, with respect to the entities, I don't believe the number count supported the statement that you just made. I don't think the evidence was one case per entity. I don't believe that's in the record. I think the arithmetic is contrary to that. What is the arithmetic? What I recall is something on the order of a few dozen or a couple of dozen entities, and then the lawsuit count was much bigger. 27 sticks in my mind, but it's just popping in there. 28 is the one in my mind, Your Honor, but I can't swear by that. So in other words, it wasn't one case per entity. That's not what happened. And of course, as Judge McKinney pointed out, there was no evidence that there was a pattern that should be of concern. The record showed only that lawsuits were filed, they weren't tried, and there were some defeats in some of the cases. But of course... I'm sorry. What do you mean? I thought that... How do you get some defeats without trying at least something? Or do you mean literally go to a trial? What I meant, Your Honor, was defeats in the form of summary judgments, PTAB orders. I thought that there were a couple of invalidity rulings in that group of cases. No? There were some invalidity rulings. Yes, Your Honor. That's the kind of defeat I was speaking of. I didn't mean a trial defeat. The evidence was that there were no trials. So they went to the merits in at least some. Absolutely they did. And that's another distinguishing factor about this case. In the Paradigm case of nuisance value settlements, the pattern this Court has identified involves litigants who never test the merits of their claims, who, as in the Newegg case, back down even though claim construction goes their way when it becomes clear that the adversary won't settle. That pattern is not present here. Indeed, to the contrary, the record shows the merits being contested, sometimes successfully, sometimes not. But in any event... Is it obligatory for an attorney who purchases a patent to determine whether the patent was obtained by fraud? I think that's a case-by-case question, Your Honor. So, for example, if a lawyer goes about buying a patent and he or she is aware of no facts suggesting fraud in the prosecution history, I don't think there's a duty to search for that absent a reason. Are these gentlemen patent lawyers? Pardon me, Your Honor? Are these gentlemen patent lawyers? Yes, Your Honor. So if you have a situation where you're buying a patent, presumably one of the things that one might want to do in a given case is review the prosecution history. And in doing so, various things might come to one's attention. But the market for purchasing patents is very broad and patents are purchased under different circumstances. It wouldn't necessarily be the case that in every instance the diligence process would include a review of the prosecution history. Was one of the grounds, I don't remember, in this case the kind of lack of due diligence before bringing the suit that occurs in some other suits? That was not a particular point that was argued in this case, Your Honor? If I remember right, there's some evidence here of, let's call it, of due diligence. Of looking into the bona fides of the patent. Yes. Into the inventor. There is. That's right, Your Honor. So how does Leslie and Cook-Brier Art not jump out and scream there's a problem? Well, Your Honor, all of the art was before the examiner. So whatever might be said about a given piece of art or the art collectively, the fact of the matter is, the art was known to the examiner and it was considered by the examiner. Now in this context, whatever stands out, whatever comes to one's attention. Did the examiner know that the inventor copied that feature from Cook? So that's a disputed point, Your Honor, whether the feature was copied. In the deposition he seems to have said it. Well, what he said was that the feature wasn't novel. Now, of course, that doesn't mean he copied the feature from Cook and it doesn't mean that when the feature is combined with the other aspects of the invention that it's necessarily invalidated. Did he say there are two features, one is the basket, and that I guess I'm remembering he said I had the drawer use a Cook model for the basket, but that's not actually the interesting feature here. The interesting feature is the movable sleeve over the wire. Did he say something about copying that from Cook? Not that I recall, Your Honor. And what he said about the other feature, I believe that the way the record reads... Cook prior art does in fact have that feature, though. Yes, Your Honor. Judge Wallach, I think what the record shows is that the inventor had the invention and turned to an artist and the artist used the Cook device for inspiration, illustration, explanation, rather than that the inventor had copied from Cook. But on the other one, Judge Toronto... Who provided that Cook patent to the artist for his inspiration? I don't remember that the record is clear on that point, Your Honor, and I'm not sure. But on the other issue, Your Honor, there was no suggestion that copying had taken place, that the testimony was simply... Do you know the answer to the question I asked your friend about who supplied... How did the Leslie patent get on the face of this patent, of your patent? I'm not recalling. I know there was a lengthy IDS that was provided, but I'm not sure, Your Honor. But the context we face here is that Judge McKinney was presented with a situation in which, as Judge Toronto was inquiring of my friend, there had not been specific identification of art. There had not been a claim that the case was frivolous. These issues had not been teed up. He took a look at those. Judge McKinney thoroughly evaluated the record. The standard of review is abuse of discretion. Judge McKinney's careful consideration does not involve an abuse. There's no suggestion of clearly erroneous fact-finding. There's no suggestion that Judge McKinney otherwise abused his discretion. Now, one issue that underlies all of this, and one particular failing by Cook, is the notion that this was about a nuisance-value settlement approach. The court has seen this approach in other cases. Cook argued that this is an example of that. Judge McKinney considered the facts. He found the claim unproved. That finding by Judge McKinney, which was a foundation for just about everything that Cook says, is sufficient to support his determination. Now, there was no evidence... That may be the foundation of just about everything that Cook says, just because they decided to use the general behavior of the people just behind SBI here as a principle argument. But that isn't the foundation of, you know, the 2 1⁄2 pages or 3 pages in the fees motion about just how extraordinarily weak the validity defense is here. So the argument was made, Judge Toronto, but in the context of things, Judge McKinney evaluated that, and we have to consider the full context there. When it came time to defend the merits of the claim before the PTAB, and remember, this was, of course, just a preliminary patent owner response, not necessarily the point at which all arguments would be martial. Did the filing before the PTAB indicate to the current patent holders that the patent might be frivolous? I wouldn't say that it did, and the argument that was made in response at the preliminary patent owner stage shows that there was clearly a non-frivolous response. The response that was made at that stage, and of course... It was just the preamble. The preamble argument. That's the argument that was made. And that was that... What was that? So the basic argument there is Sugita is not an endoscopic device. Sugita is a catheter. Their petition was about lots of stuff besides Sugita. Well, it was, but that point, the point about the endoscopic device was made in response to the three arguments that succeeded, to each of them. And that argument was well-founded. There hasn't been a specific argument by Cook that there was something that fell below the bar in the argument that was made at the preliminary response stage. The argument was well-founded based on the characteristics of Sugita. It was well-founded based on what the preamble says. And the argument that the preamble was limiting was also reasonable. And there's no suggestion that that argument was frivolous. And if there were such a suggestion, it wouldn't be well taken. So when we come to even the point at which a preliminary position was to be taken, SBI marshaled a clearly non-frivolous response to the arguments that were being made. Now, the argument didn't succeed. But as we've been told many times by this Court and by the Supreme Court, simply losing is not enough. And do we have in the Joint Appendix the preliminary response of the patent owner to the petition?  But the preliminary response is identified in the institution decision? Right, but that's a simple summary in which the board says you have only one argument. That's right, Your Honor. That's the discussion to which I referred. And in closing, as my time is ending, what I'd like to say is that the idea that there is a pattern of misconduct was not proved. Judge McKinney explicitly found that allegation not to be proved. That finding was not clearly erroneous, and it's not subject to second-guessing. Well, if it was clearly erroneous, it is subject to it. Of course, Your Honor, but because it wasn't, because it wasn't, in other words, what he found was that Cook didn't prove what it said. That was not a clearly erroneous finding. And if you even look at the argument, the way Cook described it, the argument inherently wasn't something that was going to be proved. Cook said the only inference that can be drawn is that a certain state of affairs applied. Well, Judge McKinney didn't draw that inference. It was reasonable for him to do so. Thank you. I just want to add one thing, and that is, if I was a litigant who wasn't paid by a lawyer after attorney's fees were awarded, I'd be going after their ticket. So you ought to warn your clients about that. Your Honor, there are plenty of remedies that are available if a party has genuinely been subject to something that's abusive. There are many remedies under Rule 11. I'm aware of that. I said I'd be going after his license to practice law. Thank you. Thank you, Your Honor. I'd like to first address the claim that was made that Judge McKinney thoroughly evaluated the record on the invalidity point. You will search Judge McKinney's opinion in vain for any discussion of the prior art. You will search his opinion in vain for any discussion of the prosecution history. He made no mention of the undisputed fact that the PTO issued this patent based on false statements. What false statements? The false statements that the sheath movement element was novel. Where is that? I looked for that, and I didn't find it. I know that they kept saying, it's not in subita, and that's a true statement. Yes. Where is there a statement, an affirmative statement? You made a different point in your opening argument about some sort of duty of candor that they were required to say something that they didn't. But now you just said that there's a false statement, which you also said in your brief. Can you just show me where that is? The pages that I cited earlier, they did not affirmatively, you're correct, they did not affirmatively state that this confers novelty, but that was the basis for their argument to the examiner to overcome the prior art. Yes, it's correct that it distinguished it from subita, but the implicit representation, surely, was it distinguishes it from all the prior art, including Leslie, which wasn't true. That wasn't true. My broader point, though, is simply going to Judge McKinney's analysis. He undertook no analysis of the prior art, never mentioned Leslie. He undertook no analysis of the prosecution history. He undertook no analysis of any of the really undisputed facts that we presented going to invalidity. Secondly... So he was given, I forget how long your fees petition was, 30 pages, something like that? Two and a half pages was about the merits. Overwhelmingly, what you wanted him to concentrate on was the way this was an instance of a general practice. Just how much more should he have done on what was, I don't know, 5% or something of your petition? Your Honor, I don't have the pages in front of me, but I am very confident we devoted more than two pages to the invalidity of this patent. Just the statement of facts, we recited the prosecution history at length. And by the way, in that prosecution history, we included excerpts from the deposition, the inventor, in which he... It's a 20-page petition, and the background is a lot about how Mitri and Salmon are up to no good generally, and then there's a little bit about the procedural history of this litigation, and then the case is exceptional, and the extraordinary weakness is from page 12 to page 14. On a fee request after litigation, after litigation has been disposed of, is a judge supposed to write a 70-page decision essentially doing the merits that have just gone away? No, but... We made two primary arguments going to the extraordinary weakness of the case. One was the invalidity of the patent, which was based on prior art in the prosecution history. The other was the decision to file in the Eastern District of Texas, which had absolutely no connection with any of the witnesses, any of the parties, any fact relating to the case. At a minimum, under Rothschild, in order to conduct an adequate inquiry, the district court has to address the prior art, it has to address the prosecution history, when that is the predicate for our claim that this was an extraordinarily weak piece of litigation. None of that is in Judge McKinney's opinion. The decision to file in the Eastern District of Texas was indefensible. There was no connection with the Eastern District of Texas. We made that argument, we cited this court's decisions under 1404. That's not, that can't be quite right. I mean, there was undisputedly at the time 1406 venue. Yes, yes, yeah. And they have The statutory venue. Right, and they have a very regular way of doing patent cases and it's very fast and they're extremely experienced and knowledgeable. I didn't happen to know what I don't know time to trial or something or docket load is in Indiana compared to this. No, no, but under Nintendo, under Nintendo this court made clear that if there's no connection between the district and the parties, the witnesses, the documents, or any of the other things that were about our decision making, why didn't we file for an earlier motion for summary judgment because this motion to transfer was before the Texas judge for 10 months. One of the things we had to take into account was the possibility that we were going to mandamus and the other possibility that we had to take into account is that our motion would be granted as we as it should have been as indeed the Texas court ultimately did. So if we file a motion for early summary judgment the in the Texas court in the Texas court our motion several months later is granted and then we're going to be before a new court in Indiana where the discovery is nowhere near completion. The likelihood that we were going to get an early summary judgment in my professional judgment approached zero. We thought that the IPR was going to be the fastest pathway to exit and that's what the facts showed. We got we filed the IPR in March we were out in December. One final point opposing counsel says that the evidence we presented did not show a pattern. 400 cases filed by more than 25 shell entities in none of those cases did Metri and Salmon go to trial test the merits of their claims in none of those cases those are two different things I thought in some of those cases the merits were in fact tested. In more than 130 the patent was found to be invalid and not infringed. That's a testing of the merits? I meant to trial forgive me if I misspoke. Some tiny percentage of civil cases and probably even a small percentage of patent cases actually go to trial. I understand your honor but this is 400 cases and in none of those cases was the patent was there a judgment of patent infringement. Not one. Not one time. Counsel says that the facts of this case didn't show a nuisance settlement strategy. Let's go back to the point you were raising earlier. They knew as early as January that this patent was invalid. It became clear when we filed the PTAB that the patent was invalid. What prompted them to throw in the towel? It was only when Cook made clear to them that we're going to litigate this case before the PTAB we're not going to pay a token settlement. Only then did they cancel their own patent rather than test its merits. Thank you. Thank you for your time. I appreciate it.